AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
3/13/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___jm___ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>VY THANH VO,<br><br>Defendant | LODGED<br>CLERK, U.S. DISTRICT COURT<br>3/10/2023<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___CD___ DEPUTY<br><br>Case No.  2:23-mj-01140-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 19, 2022, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi) | Distribution of Fentanyl |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Albert Polito, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  3/13/2023

Judge's signature

City and state:  Los Angeles, California

Hon. Michael Wilner, U.S. Magistrate Judge
Printed name and title

AUSA:  Jena MacCabe x5046

**AFFIDAVIT**

I, Albert Polito, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Vy Thanh VO ("VO") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi): Distribution of Fentanyl.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since January 2020. I am currently assigned to the DEA's High Intensity Drug Trafficking Area Group 48 ("HIDTA 48"), which investigates large-scale drug trafficking organizations. During my time with the DEA, I have received 640 hours of drug law enforcement training while attending DEA Basic Agent Training at the DEA Academy in Quantico, Virginia.

4. I have participated in investigations into drug trafficking and drug trafficking organizations. These investigations involved (1) the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of drugs (including cocaine, heroin, fentanyl, methamphetamine, and marijuana), (2) the laundering of drug proceeds and monetary instruments derived from drug trafficking activities, and (3) conspiracies to traffic controlled substances. I am familiar with the methods that drug traffickers use to conceal profits and launder proceeds of drug transactions. I am also experienced in the use of tracking devices, conducting surveillance, interviewing witnesses, writing affidavits for and participating in the execution of search warrants, and working with undercover agents, cooperating defendants, and confidential sources.

### III.  SUMMARY OF PROBABLE CAUSE

5. In March 2022, HIDTA 48 learned that a subject identified as VO was selling drugs in the Los Angeles area. On March 17, 2022, VO agreed to sell a confidential source working with the DEA ("CS")[1] fentanyl pills in April 2022. On April 19,

---

[1] The CS has no criminal convictions. However, in November 2021, the CS was arrested for vandalizing a car with a key, and during a DEA operation in May 2021, the CS was found in possession of a marijuana pipe and small amount of marijuana. The CS is currently providing information and actively participating in DEA investigations in exchange for payment. The CS has been paid approximately $30,000 since October 2020 when the CS began working with the DEA. The CS has provided information to law enforcement on multiple drug trafficking organizations. The CS has conducted purchases of drugs on behalf of law enforcement and made consensually recorded
*(footnote cont'd on next page)*

2022, the CS purchased approximately 2,000 fentanyl pills from VO for $3,000.

6. Between April and May 2022, the CS and VO maintained communication to arrange future drug transactions. On May 19, 2022, VO sold the CS 1,000 methamphetamine pills for $600.

7. After the two successful deals, the CS continued to communicate with VO. VO agreed to sell the CS 80,000 fentanyl pills on March 10, 2023.

## IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Background of Investigation

9. On or about March 14, 2022, the CS told HIDTA 48 about a subject who was selling fentanyl pills in the Los Angeles area.

10. The CS told HIDTA 48 that the CS was playing in an online video game chat room when he/she overheard an unidentified male ("UM-1") talking about selling "blues," which the CS believed to be fentanyl pills. I also know, based on my training and experience, that "blues" are often a code word for counterfeit oxycodone pills laced with fentanyl.

---

telephone calls, which have led to the execution of federal and state search warrants. The CS has consistently provided timely and accurate criminal intelligence and has not provided information that was later proven to be false or misleading. For these reasons, I believe that the CS's information is reliable.

3

11. The CS then spoke up and inquired about purchasing some "blues." UM-1 told the CS to follow UM-1 on Instagram, giving the user identification of "improbably faded."

12. The CS messaged UM-1 on Instagram. Based on my review of the CS's Instagram conversation with UM-1, conversations I had with the CS, and conversations I had with other law enforcement officers, I understand that the CS asked UM-1 how much a "boat" of pills (1,000 pills) would be. UM-1 replied, $1,800. The CS later asked whether, if the CS purchased four "boats" of pills (4,000 pills), the price could be $1,500 per "boat." UM-1 replied, "lemme see," then shortly after agreed to sell 4,000 fentanyl pills for $6,000. Shortly thereafter, UM-1 messaged the CS the telephone number 714-260-7353 ("VO's Telephone")[2] followed by "This my big bro if you wanna msg him chop it up playa."

13. Based on my training, experience, and knowledge of this investigation, I believe that UM-1's statement after sending the telephone number is inferring that the user of the telephone number may be UM-1's source of supply for the fentanyl pills.

14. On March 17, 2022, at approximately 6:33 p.m., under the direction of investigators, the CS called the telephone number that UM-1 gave the CS. Law enforcement later identified the person who answered the phone as VO based on telephone

---

[2] T-Mobile records for 714-260-7353 list the subscriber name as Thanh Le with an address of 117 Stoneridge Drive, Santa Ana, California 92704 (the "Stoneridge address"). A public records database shows that the Stoneridge address is associated with VO.

4

subscriber information listing an address linked to VO and the CS identifying VO's driver's license photo as the individual who the CS bought drugs from on later dates, as described below.

15. As I understand from listening to the calls, speaking with the CS, and speaking with other agents who reviewed the recorded calls, the CS asked VO about the fentanyl pills. Specifically, the CS said, "Wassup with the blues, Alex told me he talked to you about the ticket." UM-1 had told the CS to refer to UM-1 as Alex.

16. VO responded that Alex talked to him about the "blueberries" (fentanyl pills). The CS asked VO if 4,000 pills at $1,500 per 1,000 (for a total of $6,000) was still okay. VO agreed to the terms. The CS then proceeded to inform VO that he/she would not be available until the end of April. VO agreed to setting the deal at the end of April.

17. The CS maintained communication with VO using VO's Telephone. On April 14, 2022, at approximately 5:15 p.m., under the direction of investigators, the CS called VO's Telephone. Based on my review of the recorded phone calls, conversations with the CS, and conversations with investigators who reviewed the recorded calls, I believe that VO agreed to sell the CS 2,000 fentanyl pills for $3,000 on April 19, 2022, in the Lakewood or Carson, California, area.

### B. Search Warrant Authorizing Tracking Data for VO's Telephone on April 17, 2022

18. On April 17, 2022, I obtained a search warrant signed by Los Angeles County Superior Court Judge Margaret Bernal

5

authorizing disclosure of Global Positioning Systems ("GPS") data for VO's Telephone.

### C. VO Sells the CS 2,000 Fentanyl Pills on April 19, 2022

19. On April 19, 2022, HIDTA 48 and Hawthorne Police Department ("HPD") personnel met in a predetermined location with the CS in the Long Beach area. I, along with TFO Alberto Alvarado, searched the CS's person and CS's vehicle for contraband and did not find any. The CS was equipped with audio recording and listening devices.

20. On that same day, at approximately 1:10 p.m., HIDTA 48 directed the CS to go to a parking lot located at 1930 North Lakewood Boulevard, Long Beach, California (the "target location"). The CS then placed a phone call to VO's Telephone, and VO said that he was roughly 20 minutes from the target location. VO also said that he was driving a white Honda sedan.

21. At approximately 1:14 p.m., I received GPS ping data for VO's Telephone. The GPS ping data showed that VO's Telephone was located in the vicinity of latitude: 33.757285, longitude: -117.951386 with an error radius of 3,339 meters. According to a Google Maps search, the distance between the approximate coordinates and the target location is approximately 13.4 miles.

22. At approximately 1:40 p.m., SA Efrain Estrada observed a white Honda sedan with California license plate 7KXJ871 (the "white Honda"), which is registered to Hung D Vo at the Stoneridge address that is also linked to VO, park near the

6

CS'S vehicle and observed VO exit the vehicle wearing gray sweatpants, a white t-shirt, and a small backpack.

23. At approximately 1:44 p.m., I received GPS ping data for VO's Telephone. The GPS ping data showed that VO's Telephone was located in the vicinity of latitude: 33.804663, longitude: -118.147981 with an error radius of approximately 3,034 meters. According to a Google Maps search, the target location was within the radius of VO's Telephone.

24. SA Estrada observed VO walk around, appearing to look for the CS, and was simultaneously speaking to the CS on a cellphone. The CS directed VO to his/her car, and SA Estrada observed VO enter the passenger seat of the CS's vehicle.

25. At approximately 1:51 p.m., SA Estrada observed VO exit the CS's vehicle and walk back towards the white Honda, which VO drove out of the lot shortly after.

26. At that same time SAs Polito, Pearson, and Putnam led the CS to an undisclosed location for security purposes and conducted an interview. The CS provided agents with two Ziploc-style bags containing approximately 2,000 fentanyl pills, which the CS purchased from VO. Agents also searched the CS's person and vehicle for contraband and did not find any.

27. At the time of the CS interview, HPD Detective Tony Robles was able to locate Department of Motor Vehicle records for VO's California driver's license. SA Pearson then showed the driver's license photo of VO to the CS, who confirmed that the person in the photo is who he/she purchased the 2,000 pills from earlier.

28. At approximately 2:50 p.m., visual contact of the white Honda was temporarily lost near the 91 and 57 highway interchange.

29. At approximately 3:37 p.m., HPD Detective Mark Hultgren was able to re-establish surveillance of VO and the white Honda, at 1367 North Manzanita Street, Orange, California, with the help of GPS location data derived from VO's Telephone.

30. At approximately 7:22 p.m., surveillance was terminated for the day. Agents were able to determine throughout the day that GPS ping data for VO's Telephone was consistent with his movement and agents were able to determine that VO's Telephone was being used by VO.

31. The fentanyl pills were booked and processed per DEA policies and procedures and sent to the DEA Southwest Laboratory for analysis. Lab results showed an approximate net weight of 213.2 grams with the presence of fentanyl.

32. After the purchase of the fentanyl pills, the CS and VO maintained communication. Using VO's Telephone, VO agreed to sell the CS methamphetamine pills on May 19, 2022.

   **D.   VO Sells the CS 1,000 Methamphetamine Pills on May 19, 2022**

33. On May 19, 2022, at approximately 11:42 a.m., DEA SA Putnam, as I witnessed, searched the CS prior to having the CS meet with VO and did not find contraband. SA Putnam, as I witnessed, gave the CS $600 for the CS to purchase approximately 1,000 pills suspected of being laced with methamphetamine from

VO. The CS was equipped with audio and video recording devices; however, the video device did not obtain footage of VO's face.

34. At approximately 12:00 p.m., members of HIDTA 48 and HPD established surveillance in the vicinity of the Ralphs parking lot, located at 1932 North Lakewood Boulevard, Long Beach, California.

35. At approximately 12:00 p.m., the CS drove the CS's vehicle to the Ralphs parking lot. SA Putnam and I maintained surveillance on the CS's vehicle until the CS arrived at the Ralphs parking lot where other surveillance units were able to maintain surveillance on the CS's vehicle.

36. At approximately 12:08 p.m., SA Jeremy Pearson observed a light blue Lexus bearing CA license plate 8VVV073, which is registered to a lessee with a Santa Ana address. SA Pearson observed VO get out of the Lexus driver's seat, and VO opened the CS's front passenger door and got into the CS's vehicle.

37. At approximately 12:19 p.m., SA Pearson observed the front passenger's door of the CS's vehicle open, and VO got out of the vehicle. VO went back to the CS's car and was observed talking to the CS through the CS's vehicle window.

38. At approximately 12:20 p.m., VO got back into the Lexus and drove the Lexus out of the area.

39. SA Putnam and Polito directed the CS to drive back to the neutral spot and maintained surveillance on the CS's vehicle. Upon arrival to the neutral spot, the CS transferred a bag containing orange pills suspected of being laced with

9

methamphetamine and a vile containing suspected marijuana to me, as witnessed by SA Putnam. SA Putnam, as I witnessed, searched the CS and the CS's vehicle and did not find contraband.

40. The pills were processed per DEA policies and procedures. The pills were later sent to the DEA Southwest Laboratory for testing. Lab results of the pills indicated an approximate net weight of 406 grams and the presence of methamphetamine with purity of approximately 4%.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

41. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

      c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

      e.    Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

      f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g.  Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

//

//

## VI. CONCLUSION

42. For all of the reasons described above, there is probable cause to believe that VO has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi): Distribution of Fentanyl.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __13th__ day of
March, 2023.

_____
HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE